**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WM CAPITAL PARTNERS XXXIV, LLC, | |
| *Plaintiff*, | CIVIL ACTION |
| v. | NO. 15-06225 |
| LESLIE C. BARTHOLOMEW, et al., | |
| *Defendants*. | |

**PAPPERT, J.**                                                        **January 12, 2017**

<u>**MEMORANDUM**</u>

WM Capital Partners XXXIV, LLC[1] sued Leslie C. Bartholomew Jr., John T. Ruble and Richard C. Benner for breach of a Guaranty, in which each of the three Defendants personally guaranteed the payment and performance of three equipment lease agreements entered into by First Lane Entertainment, Inc, a corporation of which Defendants were officers.  Because First Lane failed to perform under all three of the leases, WM brings three counts.  Defendants failed to appear or otherwise respond to WM's complaint and WM now moves for entry of a default judgment against Defendants Ruble and Benner pursuant to Federal Rule of Civil Procedure 55.[2]

WM filed its complaint on November 18, 2015.  (ECF No. 1.)  On February 16, 2016 WM filed a motion seeking court approval to effectuate service by publication.  (ECF No. 3.)  The Court granted the motion on March 9, 2016, ordering WM to serve Defendants in conformance with Pennsylvania Rule of Civil Procedure 430.  (ECF No. 4.)  WM served

---

[1]     WM Capital Partners purchases loans under its main firm name, WM Capital partners, LLC, and then creates a new entity for each pool of loans purchased.  (Tr. of Hr'g 2, at 8:6–21, ECF No. 22.)  This facilitates the pooling of investors' money and the administration of the loans.  (*Id.*)  WM Capital Partners XXXIV, LLC is the special purpose entity that was created pursuant to WM's purchase of the loans at issue in this case.  (*Id.*)

[2]     WM does not move for entry of a default judgment against Defendant Bartholomew due to its understanding that he has declared bankruptcy.  (Tr. of Hr'g 2, at 10:17–20.)

Defendants by publication on March 17 and 18, 2016.  (ECF No. 5.)  WM moved for default judgment on June 9, 2016.  (ECF No. 6.)  The Court denied the motion without prejudice, directing WM to first file a request for an entry of default pursuant to Federal Rule of Civil Procedure 55(a).  (ECF No. 7.)  WM requested entry of default on August 3, 2016 and default was entered the same day.  (ECF No. 8.)

WM again moved for default judgment on August 5, 2016.  (ECF No. 9.)  The Court scheduled a hearing for September 27, 2016 for the purpose of ascertaining the appropriate damages and directed WM to publish notice of the hearing to Defendants.  (ECF No. 11).  At the hearing, however, Plaintiff did not provide enough evidence to enable the Court to determine the amount of damages.  (Tr. of Hr'g 1, at 15:17–18:1, ECF No. 23.)  The Court scheduled a second hearing to allow Plaintiff's Counsel to present testimony from his client which would confirm the accuracy of Plaintiff's damage calculations.  (*Id.* at 18:14–19:9.)  The hearing was held on December 5, 2016, (ECF No. 18), after which the Court requested that Plaintiff submit additional information to further aid its understanding of the underlying transactions.  WM did so in a December 9, 2016 letter to the Court.  (ECF No. 19.)

For the reasons that follow, the Court grants the motion and enters default judgment in favor of WM against Defendants Ruble and Benner for a total of $820,479.58, which includes $791,480.86 in damages, $24,863.50 in attorneys' fees and $4,135.22 in costs and expenses.

## I.

In 2008, First Lane Entertainment—a Pennsylvania Corporation of which Bartholomew was the President, Ruble was the Vice President and Benner was the Secretary—entered into three equipment leases with Elex Group, Inc. on November 3, November 25, and December 21, respectively ("Equipment Leases").  (Pl.'s Compl., ¶¶ 18, 21, 24, Exs. 4, 7, 10, ECF No. 1.)  The

first Lease (N280962) contemplated that First Lane would pay Elex $9,075 per month for eighty-four consecutive months.  (*Id.* Ex 4.)  The second Lease (N280974) was for $3,550 per month for eighty-four months.  (*Id.* Ex. 7.)  The third Lease (N280975) was initially for $1,045 per month for eighty-three months, (*id.* Ex. 10), but in October 2011, Elex and First lane modified it to be for a term of sixty-three months with varying amounts due monthly, (*id.* Ex. 10).  On November 3, 2008 all three Defendants signed a Guaranty, jointly and severally guaranteeing payment and performance under the three Equipment Leases.  (*Id.* Ex. 2.)  An "Agreement for Leasing," incorporated into all of the Leases by reference, set forth the terms and conditions of the Leases as well as the covenants governing them, including, *inter alia*, a provision regarding late charges in the event of non-payment and a provision regarding reimbursement for attorneys' fees and other expenses incurred in enforcing the lessor's rights.  (*Id.* ¶ 15, Ex. 3.)  Pursuant to the Agreement for Leasing, a failure to pay rent when due or a failure to perform any other term or condition of the Lease for thirty days constituted default.  (*Id.* Ex. 3, § (2)(j)(1).)  Upon default, First Lane would be liable to Elex for the balance of the rent due under the Lease, as well as any amounts due as additional rent or late charges.  (*Id.* Ex. 3, § (2)(j)(2).)

The Agreement for Leasing also states:

> If ELEX is subjected to any liability because of any non-compliance with the Lease or any regulatory law applicable to any of the Equipment on the part of the Lessee, then upon notice to the Lessee of the nature and/or amount thereof, the Lessee shall forthwith discharge the same, and if ELEX shall incur any expense by reason thereof, the amount of such expense shall be added to the installment of rent next falling due as additional rent.

(*Id.* Ex. 3, § (2)(b).)

Elex financed its purchases of the equipment subject to these Leases by obtaining three installment note loans ("Installment Notes") from Nova Bank.  Nova Bank extended three Installment Notes to Elex in the amounts of $495,000, $194,000 and $56,000, respectively, each

corresponding to the purchase of the equipment in one of the three Leases.  (*Id.* Exs. 5, 8 and 11.)

Each Installment Note was secured by a Security Agreement, pursuant to which Elex granted

Nova Bank a security interest in the equipment.  (*Id.* ¶ 26.)  The Security Agreements also

contained a provision for the collection of all costs, including reasonable attorneys' fees,

incurred by the lender in the direct exercise of any of its rights or remedies under the agreement.

(*Id.* ¶¶ 20, 23, 26, Exs. 6, 9, 12.)

As additional security for the Installment Notes, Elex executed three Collateral

Assignments, assigning all of its rights and interests under the three Equipment Leases with First

Lane to Nova Bank.  (*Id.* ¶ 27, Ex. 13.)  The payments due from First Lane under the Equipment

Leases were thus pledged to pay the debt service on the Installment Notes and were the sole

source of payment on the Notes.  (*Id.* Exs. 12, 13); *see also* (ECF No. 19).  Each Collateral

Assignment specified that Elex assigned to Nova Bank its "rights to receive all sums due or to

become due under the Lease, all claims for damages arising out of the breach thereof and all

rights of Elex to accelerate the Lease, to perform thereunder and to compel performance of the

terms thereof," "up to the amount due under the Note for which this Collateral Assignment is

given as security."  (*Id.* Ex. 13.)

The Installment Notes, the Security Agreements and the Collateral Assignments all

contained provisions specifying what would happen in the event that Elex defaulted on the

Installment Notes.  Nova Bank (or its successor lender) would have no recourse against Elex

other than to levy execution against the collateral (*i.e.* the equipment and the sums payable under

the Equipment Leases).  (*Id.* Exs. 5, 8, 11.)  In other words, Elex would not be obligated to pay

the principal balance, interest or other sums due under the Notes "out of any assets other than the

rentals or other sums payable under the Lease."  (*Id.*)  The Installment Notes did, however, give

the lender the authority, upon Elex's default, to "declare the balance of the installments under this Note to be immediately due and payable forthwith and any other amounts then accrued and unpaid shall be then due and payable forthwith," as well as "retain all payments then or thereafter made pursuant to the Collateral Assignment and apply the same in reduction of this Note." (*Id.*)  The Collateral Assignments, in turn, gave Nova Bank (and its successors and assigns) the "full power (in the name of Elex or otherwise) to ask, require, demand and receive all moneys and claims for money due, and to become due under, or arising out of the Lease[s]" and stated that the Assignments would remain in force until the "balance[s] due in connection with Elex's acquisition of the equipment subject to the Lease[s] . . . including interest thereon and any renewals thereof is paid in full." (*Id.* Ex. 13.)

Sometime before October 2012, First Lane defaulted under the Equipment Leases, causing Elex to default under the Installment Notes.  NOVA Bank went under and closed on October 26, 2012, causing the Federal Deposit Insurance Corporation ("FDIC") to become its receiver.[3]  The FDIC packages distressed assets into bundles, or pools, and then auctions the pools off to the highest bidders.  (Tr. of Hr'g 2, 9:10–24.)  Plaintiff WM, a small investment firm, is in the business of bidding on and, if successful, purchasing these pools of distressed assets.  (Tr. of Hr'g 2, at 6:6–7.)  Through these purchases, WM essentially takes the place of the previous lenders and works with the borrowers to collect payments, modify the loans or, if real estate is involved, foreclose upon and sell the property.  (*Id.* at 6:6–22.)

On March 28, 2013 the FDIC, as receiver for Nova Bank, entered into a Loan Sale Agreement with WM, pursuant to which WM purchased two loan pools, which included the Installment Notes from Nova Bank to Elex associated with the three Equipment Leases between Elex and First Lane.  (*Id.* ¶ 28.)  On the same day, the FDIC executed a Bill of Sale confirming

---

[3]  *See* FDIC, Failed Bank List, https://www.fdic.gov/bank/individual/failed/banklist.html.

WM's purchase of all of the rights, titles and interests of Nova Bank in the loan transaction.  (*Id.* ¶ 32, Ex. 1.)  FDIC and WM also executed an Assignment and Assumption of Interest and Obligations Agreement ("Assumption of Interest Agreement") with respect to the Installment Notes whereby WM "stepped into the shoes" of Nova Bank under the loan documents, including with respect to its rights to collect payments under the Equipment Leases with First Lane (and demand performance thereunder in the event of Elex's default) pursuant to the Collateral Assignments.  (*Id.* ¶¶ 28–29, Ex. 14.)

First Lane defaulted under the Equipment Leases; Elex defaulted under the Installment Notes.  No payments have been made on the Installment Notes since at least 2012 (and possibly earlier).  (Tr. of Hr'g 2, at 7:25–8:4.)  The unpaid balances under the Installment Notes are $404,441.11, $156,533.66 and $43,990.87, respectively, plus the interest that has accrued on each.  (Pl.'s Compl., ¶¶ 43, 54, 65.)  Because WM stepped into Nova Bank's shoes, it has no recourse against Elex; its only recourse is against the collateral.  The Assumption of Interest Agreement entitles WM to exercise the lender's rights pursuant to the Collateral Assignments and collect from First Lane the payments due under the Equipment Leases up to the amounts due on the Installment Notes for which they were used as security.  Finally, on October 28, 2015 Elex executed an Assignment of Guaranty, assigning to WM its rights under the November 3, 2008 Guaranty to pursue the guarantors in the event of non-payment under the Equipment Leases.  (*Id.* ¶ 31, Ex. 15.)  WM thus holds Elex's rights under the Equipment Leases as successor to Nova Bank, (*id.* Ex. 14), and its rights under the Guaranty as the direct assignee of Elex, (*id.* Ex. 15).

WM seeks to pursue its rights under the Leases and, since First Lane has defaulted, the Guaranty, to recover from Defendants Ruble and Benner payments due under the Equipment

Leases up to the current amount due on the Installment Notes.  Because the Defendants have neither appeared nor filed an answer in this lawsuit, WM seeks an entry of default judgment.

## II.

Federal Rule of Civil Procedure 55 governs the entry of default judgment.  Three factors control whether a default judgment should be granted: (1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct.  *See United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984).  The Court must consider and make explicit factual findings as to these three factors.  *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir. 1987).  Moreover, before a court can enter a default judgment, a plaintiff must present evidence of: (1) the court's basis of personal jurisdiction over defaulting defendants; (2) proper service of process upon defaulting defendants; (3) facts necessary to state a cause of action; and (4) the amount claimed in damages.  *D'Onofrio v. II Mattino*, 430 F. Supp. 2d 431, 436 (E.D. Pa. 2006).

### A.

The Court has personal jurisdiction over the Defendants.  When a court considers personal jurisdiction in the posture of a default judgment, "although the plaintiffs retain the burden of proving personal jurisdiction, they can satisfy that burden with a *prima facie* showing," and "may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain."  *D'Onofrio*, 430 F. Supp. 2d at 437 (quoting *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005)).  WM alleges that Defendants are citizens of Pennsylvania and has provided a Pennsylvania address for each.  (Pl.'s Compl. ¶ 6.)  WM also alleges that the Defendants did business in Pennsylvania and had substantial contacts with the state in their capacities as officers of First Lane, a Pennsylvania corporation with an address of

7

1541 Stanford Road, Bethlehem, Pennsylvania 18018 and offices at 702-716 Union Boulevard, Allentown, Pennsylvania 18019. (*Id.* ¶¶ 9, 13.) Ruble was the Vice President of First Lane; Benner was the Secretary. WM also alleges that some of the events or omissions giving rise to its claims occurred in this district. The Defendants personally guaranteed First Lane's performance under the three Equipment Leases, pursuant to which they acquired equipment for their Pennsylvania-based corporation. Taking these allegations as true, WM has alleged sufficient facts to support personal jurisdiction.

**B.**

Before granting a default judgment, the Court must determine whether there is sufficient proof of service. *Gold Kist, Inc. v. Laurinburg Oil Co., Inc.*, 756 F.2d 14, 19 (3d Cir. 1985). Here, WM was unable to locate Defendants despite considerable efforts to do so. Because WM was unable to effectuate personal service, it instead served Defendants by publication. Federal Rule of Civil Procedure 4(e)(1) permits service by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). Pennsylvania law permits service by publication under certain circumstances; Plaintiffs must move for a special court order and submit an affidavit stating the nature and extent of the investigation and why service cannot be made. *See* Pa. R. Civ. P. 430(a). "District courts in the Third Circuit have repeatedly held that a plaintiff moving for alternative service, such as service by publication, must establish three elements: (1) a good faith effort to locate the defendant; (2) practical efforts to serve the defendant under the circumstances; and (3) a method of alternative service that is reasonably calculated to provide the defendant with notice." *Barbosa v. Dana Capital Group, Inc.*, No. 07-1724, 2009 WL 902339, at *4 (E.D. Pa. Mar. 31, 2009).

WM moved for the Court's approval of service by publication on February 16, 2016. (ECF No. 3.)  With the motion, Counsel submitted an affidavit detailing WM's good faith effort to locate and serve the Defendants.  (*Id.*)  He stated that the investigation had included, *inter alia*, internet searches, person searches on WestLaw, professional license searches, department of motor vehicle searches, local newspaper searches and searches of real estate records and tax records in both Lehigh and Northampton Counties.  (*Id.* ¶ 4.)  Counsel subscribed to a Westlaw service that searches for people and businesses; the search returned an address of 1015 Honeysuckle Road, Walnutport, Pennsylvania 18088 for Ruble and an address of 241 E. Market Street, Bethlehem, PA 18018 for Benner.  (ECF No. 3, Ex. 3, ¶¶ 3–4.)

While county tax files purported to confirm Benner's ownership of the Market Street property, they showed that Ruble did not own the Walnutport property.  (*Id.* ¶¶ 5–6.)  Ruble's private pilot license, however, issued by the Federal Aviation Administration and current as of January 16, 2016, *did* list the Walnutport property as his residence.  (*Id.* ¶ 7.)  In December 2015, Counsel attempted to serve Defendants at these addresses via certified mail, return receipt requested.  (ECF No. 20.)  The documents, however, were returned as "moved, left no address" as to Ruble and "unclaimed" as to Benner. (*Id.*)

Counsel then had a constable attempt to locate the Defendants at these residences multiple times on different dates, to no avail.  (*Id.* ¶ 9; Tr. of Hr'g 2, at 24:19–21; Aff. of Attempted Service, ECF No. 21.)  The server made three different attempts to serve Ruble at the Walnutport property, two of them at night.  (ECF No. 21.)  In his Affadavit of Attempted Service, the server noted that while no lights were on inside, a motion-activated light above the garage door was functioning, signaling that the electricity service at the house was on.  (*Id.*)  All three attempts, however, were fruitless.  The server only attempted service on Benner at the

9

Market Street property once because the house was clearly unoccupied; in his Affadavit, the server noted the presence of several notices on the door, including an official one from the city regarding the condition of the house from September and another signed by "the Benner Family," dated in July, asking people to respect their privacy during their difficult times and stating that the family would be returning for personalty.  (*Id.*)

Through additional online searches, Counsel subsequently determined that Ruble worked in some capacity at Rivals Sports Bar located at 5 Lehn's Ct, Easton, PA 18042.  (ECF No. 3, Ex. 3, ¶ 10.)  And by searching federal and state case dockets, Counsel determined that Benner may have taken up residence at 2041 Black River Road, Bethlehem, PA 18015.  (*Id.* ¶ 11.)  A process server unsuccessfully attempted to serve the Defendants at these properties on January 18, 2016.  (*Id.* ¶ 12.)  The server was told that Ruble no longer worked at the Easton property and his whereabouts were unknown and that Benner no longer lived at the Bethlehem property and that his whereabouts were also unknown.  (*Id.*)  Finally, Plaintiff's Counsel, through his communications with Defendant Bartholomew's Counsel, inquired as to whether Bartholomew could aid him in locating the other two Defendants.  (Tr. of Hr'g 1, at 8:12–23.)  Bartholomew, however, claimed he had no knowledge regarding their whereabouts.  (*Id.*)  WM made several efforts to obtain credible information about Defendants' whereabouts and numerous attempts to personally serve them at various locations.

Lastly, the Court was satisfied that the service by publication contemplated by WM was reasonably calculated to give Defendants actual notice of the pending suit.  *See Barbosa*, 2009 WL 902339, at *4.  Pennsylvania requires that service by publication be made "by advertising a notice of the action once in the legal publication, if any, designated by the court for the publication of legal notices and in one newspaper of general circulation within the county."  Pa.

R. Civ. P. 430(b)(1).  Consistent with this requirement, WM sought service by publication in *The Morning Call* and *The Lehigh Law Journal*.

For service to be reasonably calculated to provide the defendant with actual notice, merely publishing in a widely circulated publication does not suffice.  *Barbosa*, 2009 WL 902339, at *7 (citations omitted).  Some courts have held that the plaintiff must have specific information about where the defendant lives or works.  *Id.* (citing *Clayman v. Jung*, 173 F.R.D. 138, 139–140 (E.D. Pa. 1997)).  Other courts have found that publication in a journal circulated in the vicinity of the defendant's last known address, in the absence of any evidence that he has moved outside of the circulation area, is reasonably calculated to provide actual notice.  *See Braverman Kaskey, P.C. v. Toidze*, No. 09-3470, 2013 WL 6095679, at *5 (E.D. Pa. Nov. 19, 2013), *aff'd*, 599 F. App'x 448 (3d Cir. 2015); *Romeo v. Looks*, 535 A.2d 1101, 1107 (Pa. Super. Ct. 1987).

*The Morning Call* is the third largest newspaper in Pennsylvania and is widely circulated throughout Allentown, Bethlehem, Easton, the Poconos, Lehighton, Quakertown and the Lehigh Valley.[4]  *The Lehigh Law Journal* is published within Lehigh County, which is located in the Lehigh Valley and encompasses Allentown and part of Bethlehem.[5]  Although Benner had left his prior residence, there was no evidence that he had relocated outside the area and, at a minimum, his family's note indicated that he would be returning to the area to settle his affairs.  Likewise, there was no evidence that Ruble had moved outside of the circulation area.  In fact, all of the evidence produced by the investigation suggested potential ties to Bethlehem, Walnutport or Easton.  Moreover, it is likely that Defendants maintained ties to the city of

---

[4]      *See* The Morning Call History, The Morning Call (June 16, 2016, 5:22 PM), http://www.mcall.com/about/mc-morning-call-history-story.html.

[5]      *See* Map of Municipalities, Lehigh County (2017), https://www.lehighcounty.org/Community/Boroughs-Townships.

Allentown, in which they based and conducted their business for many years. *See Kittanning Coal Co., Inc. v. Int'l Min. Co., Inc.*, 551 F. Supp. 834, 838 (W.D. Pa. 1982) (anticipating that the defendant, though unlocated, had retained some contacts in the district since his alleged actions took place there). WM thus utilized widely circulated publications in the areas where Defendants previously lived and worked and to which they had likely retained contacts. The Court thus found that such service was reasonably calculated to provide actual notice and on March 9, 2016 granted WM's request to effectuate service by publication. (ECF No. 4.)

WM effectuated publication in *The Morning Call* on March 17, 2016 and in *The Lehigh Law Journal* on March 18, 2016. (ECF No. 5.) Thereafter, in September and again in November 2016, WM published notice of both of the hearings held before the Court in both publications and submitted proof of the same. (ECF Nos. 12 & 17.) This constitutes sufficient proof of service.

### C.

Taking the facts alleged by WM as true, WM has stated a cause of action for breach of guaranty. *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 (3d Cir. 2005) ("[T]he factual allegations in a complaint, other than those as to damages, are treated as conceded by the defendant."). Elex financed its purchase of the equipment by obtaining Installment Note loans from Nova Bank. As collateral, Elex assigned to Nova Bank its rights to receive payments under the Equipment Leases (up to the amounts owed on the Installment Notes). First Lane ceased performance under the Equipment Leases, causing Elex to default on the Installment Notes. Upon Elex's default, Nova Bank was entitled to recoup the amount still owed on the Notes by levying execution against the collateral, *i.e.*, by collecting money from First Lane pursuant to First Lane's obligations under the Equipment Leases. WM, having stepped into Nova Bank's role as lender,

is likewise entitled to performance from First Lane up to the sums owed under the Installment Notes.

Ruble and Benner guaranteed First Lane's performance under the Equipment Leases with Elex.  (Pl.'s Compl. ¶ 35, Ex. 15.)  The Defendants guaranteed that First Lane would "promptly perform and comply with each of its agreements contained in the Lease, and that all sums payable by the Lessee under such Lease will be promptly paid when due in accordance with the provisions thereof."  (*Id.*, Ex. 15, ¶ 1.)  The Guaranty specifies that Defendants' obligations under it are "joint and several, and are independent of the obligations of [First Lane]."  (*Id.* Ex. 15, ¶ 6.)  The Guaranty further states that it "shall be construed as a continuing, absolute and unconditional guaranty of payment."  (*Id.* Ex. 15, ¶ 8.)  Finally, the Guaranty provides that "Elex may assign this instrument or any rights and powers hereunder with any assignment of such Lease or any sums due or to become due, or any rights, claims, powers and remedies thereunder and, in the event of such assignment, such assignee shall have the same rights and remedies as if originally named herein."  (*Id.* Ex. 15, ¶ 4.)

The Guaranty executed by Defendants provides that it is to be governed by New Jersey law.  (*Id.*, Ex. 15, ¶ 10.)  Such contractual choice of law provisions are generally enforceable. *Kruzits v. Okuma Machine Tool*, 40 F.3d 52, 55 (3d Cir. 1994).  "A guaranty is a contract and must be interpreted according to its clear terms so as to effect the objective expectations of the parties." *Wachovia Bank v. Credit Doctor, Inc.*, No. L–6122–08, 2011 WL 3819802, at *8 (N.J. Super. Ct. App. Div. Aug. 31, 2011).  By its clear terms, the Guaranty signed by Defendants was an unconditional guaranty of payment.  First Lane has failed to make the payments due under the Leases.  Thus, Defendants breached the Guaranty by failing to assure First Lane's performance under the Equipment Leases. *See Westville Land Co. v. Handle*, 171 A. 520, 523 (N.J. 1934)

("In the case of a guaranty the covenant is collateral to the other contract and the failure of the

third party is a breach of the terms of the contract of guaranty.")  As a result, WM has suffered

significant losses due to its inability to recoup the debt it is owed by collecting the payments due

under the Leases.

## D.

### i.

Finally, a plaintiff seeking default judgment must present evidence of the amount claimed

in damages.  *Rainey v. Diamond State Port Corp.*, 354 F. App'x 722, 724 (3d Cir. 2009).  WM,

as Nova Bank's successor, is entitled to recover from the collateral "up to the amount due under

the Note[s]." (Pl.'s Compl., Ex. 13.)  The Collateral Assignments give WM the "full power . . .

to ask, require, demand and receive all moneys and claims for money due, and to become due

under, or arising out of the Lease . . ." and remain in effect until the balance of the Notes

"(including interest thereon and any renewals thereof) is paid in full."  (*Id.*)  The appropriate

amount of damages then is the sum of the outstanding amounts owed by Elex under the Notes.

WM itself acknowledges that this is the proper measure of damages.  *See* (ECF No. 19)

("Plaintiff may . . . recover amounts due under the Equipment Leases *up to the current amount of

the Installment Notes*" (emphasis added)).  If the damages are not for a "sum certain or for a sum

which can by computation be made certain," Fed. R. Civ. P. 55(b)(1), the "court may conduct

such hearings or order such references as it deems necessary and proper."  Fed. R. Civ. P.

55(b)(2).

With its motion for default judgment, WM submitted an Affadavit of Damages

purporting to show the amounts owed under the Installment Notes.  In an effort to better

understand the calculations and ensure their accuracy, the Court held a hearing on September 27,

14

2016.  (ECF No. 13.)  At the hearing, however, WM's Counsel was unable to provide the Court with specific information about the sources of the figures allegedly owed under the Notes or the methods by which the proposed damages had been calculated.  (Tr. of Hearing 1, at 15:17–18:1.) The Court thus held a second hearing on December 5, 2016 for the same purpose.  At that hearing, Evan Waller, an Asset Manager for WM, testified about the calculations and submitted additional information, including a purported summary of the amounts owed under each of the Notes updated as of October 2016.  (Aff. Ex. B, ECF No. 15.)

For each Note, the amount purportedly owed was the sum of the unpaid balance of the principal, the interest that has accrued and the amount allegedly owed in late charges.[6]  (*Id.*)  For the $495,000 note, WM submits that the unpaid balance is $404,441.11, the interest accrued is $127,680.76 and the late charges are $23,495.37.  (*Id.*)  For the $194,000 note, it states that the unpaid balance is $156,533.66, the interest accrued is $45,927.41 and the late charges are $5,274.56.  (*Id.*)  And for the $56,000 note, it claims that the unpaid balance is $43,990.87, the interest accrued is $12,907.05 and the late charges are $1,443.14.  (*Id.*)  WM also submitted to the Court the payoff statements and payoff histories that it received for each Note from Nova Bank when it took over servicing the loans in 2012, upon which WM based its calculations.  (*Id.*; Tr. of Hr'g 2, at 17:1–16, 18:3–6, 22:19–22.)

None of the documents relating to the loan transaction between Elex and Nova Bank, however, contain a provision relating to "late charges."  The Installment Notes themselves, the Security Agreements and the Collateral Assignments are all silent as to any late charges applicable to Elex's obligations under the Notes.  The only provision for late charges identified

---

[6]    WM's initial calculations also included figures for "forbearance interest" as part of the amounts allegedly owed under the Notes.  In its second submission, however, WM dropped the forbearance interest from its calculations because although the payout statements from Nova Bank showed forbearance interest as part of the debts, WM "couldn't exactly figure out how they calculated that forbearance" and thus "decided just to drop that figure from [their] amount and just made it a zero balance."  (Tr. of Hearing 2, at 17:25–18:6.)

by WM is that contained in the Agreement for Leasing, which set out additional terms of the

Equipment Leases between First Lane and Elex.  The Agreement states:

> If any installment of rent is not paid within ten (10) days following the due date thereof; a late charge equal to five percent (5%) of such installment shall be due and payable as additional rent, and thereafter an additional late charge of five percent (5%) of the then unpaid installment and late charges shall be due and payable as of the eleventh day of each succeeding month thereafter until such installment is paid.

(Pl.'s Compl., Ex. 3, § (2)(j)(2).)

The 5% late charge was thus a condition of the Equipment Leases, relating only to First

Lane's potential liability to Elex.  No such term was present in the loan documents relevant to

Elex's liability to Nova Bank.  This distinction is important because, as established above, WM

is only entitled to recover up to the amount of Elex's liability under the Notes.  A term contained

in an entirely separate contract (the Equipment Leases), between different parties, which

permitted Elex to impose late charges on First Lane, should not be included in the contracts of a

separate transaction, considered a term of that loan and then used to enhance Elex's alleged

liability to Nova Bank (or its successor) under the Notes.

Looking at WM's calculations in conjunction with the payoff statements and histories of

the Notes, however, this is what appears to have happened.  In the "Elex Payoff Summary"

section of the documentation submitted by WM, which purports to show a summary of the

amounts owed under each of the Notes, WM lists the "Original Loan Details" for each of the

three Installment Notes.  (Aff. Ex. B, ECF No. 15.)  These "Details" purport to summarize the

terms of each loan, including the original Note amount, the loan number, the applicable interest

rate, the day code, the monthly payment, the due date, the term for late fees and the maturity

date.  (*Id.*)  Despite the absence of any term for late charges in the loan documents, the "Details"

for each of the three loans include such a term—"5%, 11 days grace period" for the first two

16

Notes and "$25, 11 days grace period" for the third Note. (*Id.*) The "Details" regarding the applicable interest rates are also inconsistent with the actual terms contained in the Notes—whereas all three Notes uniformly state that the applicable interest rate is 7% per annum, (Pl.'s Compl., Exs. 5, 8, 11), the "Details" in WM's submission state that the interest rate applicable to the second and third Notes is 6.5% rather than 7%, (Aff. Ex. B, ECF No. 15).

WM's Evan Waller testified that when WM purchases loans, it receives information from the bank about the loans' terms and the amounts owed via the payoff statements and histories, and WM's accountants then "onboard those amounts into [WM's] system" and "service the loan from that point forward using those amounts." (Tr. of Hr'g 2, at 17:1–16.) Both WM's initial determination of the terms of the Installment Note loans in 2012 and its recent calculations updating the amounts owed under the Notes from 2012 to the present were based on the payoff statements it received from Nova Bank. *See* (*id.* at 18:3–6, 22:19–22).

The payoff statements show that Nova Bank had the Installment Note loans entered into its system with the same (inconsistent with the documents) terms for late charges and applicable interest rates as those contained in the payoff summaries submitted by WM. (Aff. Ex. B, ECF No. 15.) It appears that the inconsistencies between the terms used to calculate Elex's liability under the Notes and the terms actually contained in the Notes originated with Nova Bank and were overlooked by WM when it took over servicing the loans. There is nothing in the documents indicating how the late charge term from a different contract between different parties came to be applied to the Installment Notes or why a lower interest rate was substituted for the rate contained in the contracts for the second and third Notes.

Waller's testimony likewise does not provide the Court with a basis for applying the late charge term to the amount owed under Installment Notes. Referring to the Agreement for

Leasing (between First Lane and Elex), Waller stated: "in that document you'll see the late fee that we charge for the nonpayment of the leases.  That's where that calculation came from."  (Tr. of Hr'g 2, at 11:2–7.)  In other words, Waller confirmed that the late charges calculated into WM's proposed damages were based on the 5% late charge term contained in the Equipment Leases.  Waller did not, however, explain why that term, from the Equipment Leases, would have any effect on Elex's liability under the terms of the Notes.  Increases to First Lane's liability (to Elex) under the Leases due to penalties for non-payment are essentially irrelevant—WM is not entitled to collect payment from First Lane up to First Lane's full liability under the Leases, but rather only up to Elex's full liability under the Notes.

"When a plaintiff prevails by default, he or she is not automatically entitled to the damages they originally demanded." *Rainey*, 354 F. App'x at 724 (citing *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)).  "Rather, defaults are treated as admissions of the facts alleged, but a plaintiff may still be required to prove that he or she is entitled to the damages sought." *Id.* (citing *Corbin*, 908 F.2d at1149; *DIRECTV Inc.*, 431 F.3d at 165).  District courts must conduct an inquiry in order to ascertain the amount of damages with reasonable certainty. *Bricklayers & Allied Craftworkers v. WaterControl Servs., Inc.*, No. 09-3935, 2012 WL 3104437, at *7 (E.D. Pa. July 30, 2012) (quoting *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).  In performing this task, "[t]he district court has considerable latitude in determining the amount of damages." *Trickel v. Disc. Gold Brokers, Inc.*, No. 3:14-1916, 2016 WL 4435699, at *6 (M.D. Pa. Jan. 5, 2016) (quoting *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4 (1st Cir. 1993)).

In short, the Court must ensure that there is a basis for the damages specified in the default judgment. *See Trickel*, 2016 WL 4435699, at *6 (citing *Transatlantic Marine Claims*

*Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997)).

Here, although WM has submitted documentation showing that the late charge provision has in

fact been applied to enhance Elex's liability under the Notes in its system, the Court can find no

basis for such application pursuant to either the language in the contracts or the testimony

offered by WM.  Because the Court is not reasonably certain that the late charges are a valid part

of Elex's liability under the Notes, it would be improper to include them in the award of

damages.  *See Penn-Mont Benefit Servs. v. United States*, No. 13-4130, 2015 WL 5000896, at *8

(E.D. Pa. Aug. 20, 2015).  Rather, based on the contractual language, the Court finds that the

amounts owed under the Notes—which WM is entitled to recoup against the collateral—include

only the unpaid balances and the interest accumulated thereon.  *See Pope v. United States*, 323

U.S. 1, 12 (1944) ("It is familiar practice and an exercise of judicial power for a court upon

default, by taking evidence when necessary or by computation from facts of record, to fix the

amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly.").

The documentation that WM has submitted in support of these figures suffices.[7]  The amounts

owed under the Notes are $532,121.87, $202,461.07 and $56,897.92, respectively.  (Aff. Ex. B,

ECF No. 15.)  WM has therefore sufficiently proven that it is entitled to a total of $791,480.86 in

damages.

**ii.**

WM also seeks reasonable attorneys' fees.  The Agreement for Leasing states that in the

event of default, First Lane shall "pay Elex a reasonable sum as and for attorneys' fees and an

amount equal to such unreimbursed expenses as shall have been paid or incurred by Elex in the

seizure of the Equipment or any Unit, or in the enforcement of Elex's rights or privileged

---

[7]      Although WM used the lower interest rate of 6.5% in calculating the interest owed under the second and third Notes rather than the 7% rate contemplated by the Notes themselves, WM is entitled to the amounts requested.

hereunder." (Pl.'s Compl., Ex. 3, § (2)(j)(2).)  Pursuant to its authority as successor lender under the Collateral Assignments, WM is stepping into Elex's shoes under the Leasing Agreements and enforcing Elex's rights and interests under the Leasing Agreements.  Although this authority is limited (WM may only enforce Elex's rights and interests under the Leases *up to Elex's liability under the Notes*), WM is nevertheless entitled to the same remedies that were contemplated to compensate Elex (or its successor) for expenses incurred in enforcing any of its rights and interests under the Leases in the event that it had to bring such an enforcement action, including a reasonable sum for attorneys' fees.  *See* (*id.* Ex. 3, §§ (2)(j)(2), (2)(k)).

Under New Jersey law, parties may agree by contract to pay attorneys' fees, *see Days Inn Worldwide, Inc. v. Satyam Shivam Assoc., LLC*, No. 1938-05, 2008 WL 3287234, at *6 (N.J. Super. Ct. App. Div. Aug. 12, 2008), and a contract clause that permits an aggrieved party to recover fixed or "reasonable" attorneys' fees as part of damages is enforceable, *see Ctr. Grove Assoc. v. Hoerr*, 370 A.2d 55, 56 (N.J. Super. Ct. App. Div. 1977) (collecting cases).  New Jersey courts apply the same test for reasonable attorneys' fees in contract cases used in other attorneys' fee award cases in New Jersey.  *See Litton Indus., Inc. v. IMO Indus., Inc.*, 982 A.2d 420, 428 (N.J. 2009); *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., Div. of Keller Sys., Inc.*, 730 A.2d 843, 848 (N.J. 1999).

In determining the reasonableness of an attorneys' fee award, the threshold issue is "whether the party seeking the fee prevailed in the litigation."  *Litton*, 982 A.2d at 428.  In that regard, the party must establish that the "lawsuit was causally related to securing the relief obtained; a fee award is justified if [the party's] efforts are a necessary and important factor in obtaining the relief."  *Id.* (quoting *Singer v. State*, 472 A.2d 138 (N.J. 1984)).  Here, WM satisfies the tests for the award of fees.  It prevailed on its breach of guaranty claims, and the

Guaranty, read in conjunction with the Agreement for Leasing, renders Defendants liable to WM for the losses it has incurred in enforcing its rights.  *See id.*

With respect to the amount of attorneys' fees, the award must be reasonable in light of the factors enumerated by Rule 1.5[8] of the New Jersey Rules of Professional Conduct and plaintiff must support its attorney fee application with an affidavit or certification of services from its counsel.  *Id.*  The Court must determine the reasonableness of the hourly rate of "the prevailing attorney in comparison to rates for similar services by lawyers of reasonably comparable skill, experience, and reputation in the community."  *Furst v. Einstein Moomjy, Inc.*, 860 A.2d 435, 447 (N.J. 2004) (internal quotations omitted).  The Court must also determine the reasonableness of the time expended by considering "whether the time expended in pursuit of the 'interests to be vindicated,' the 'underlying statutory objectives,' and recoverable damages is equivalent to the time 'competent counsel reasonably would have expended to achieve a comparable result.'"  *Id.* (quoting *Rendine v. Pantzer*, 661 A.2d 1202, 1227 (N.J. 1995)). "Whether the hours the prevailing attorney devoted to any part of a case are excessive ultimately requires a consideration of what is reasonable under the circumstances."  *Id.*  Also relevant to the reasonableness of the time expended is the requesting party's degree of success, and courts may reduce the fee to account for limited success, such as where the party only succeeded on some of its claims for relief.  *Id.*; *see also Litton*, 982 A.2d at 429.  To be sure, there is no precise formula for this analysis.  "The ultimate goal is to approve a reasonable attorney's fee that is not excessive."  *Litton*, 982 A.2d at 429.

---

[8]     Rule 1.5 specifies that the factors to be considered in determining the reasonableness of a fee include, (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; (8) whether the fee is fixed or contingent.  N.J. Rules Prof'l Conduct R. 1.5.

Here, the legal services were handled by the law firm of Davison & McCarthy.  (Aff. Ex.

A, ECF No. 15.)  While four attorneys and two legal assistants worked on the matter, Timothy T.

Stevens served as lead counsel on the case.  (*Id.* ¶¶ 6, 14.)  Stevens represents clients in civil

litigation matters before state courts, federal courts and government agencies with a primary

focus on commercial litigation.  (*Id.* ¶ 4.)  As an attorney with over twenty-five years of

experience in civil litigation primarily in eastern Pennsylvania, his hourly litigation rate is $300.

(*Id.*)  In comparison to rates for similar services by lawyers of reasonably comparable skill,

experience, and reputation in the community, this rate is reasonable.[9]  *See Great W. Min. &*

*Mineral Co. v. ADR Options, Inc.*, No. 09-2907, 2012 WL 5200068, at *3 (D.N.J. Oct. 22, 2012)

(finding hourly rate of $300 reasonable for attorney with ten years of experience in commercial

litigation); *Mitchell v. City of Philadelphia*, No. 99-6306, 2010 WL 1370863, at *14 (E.D. Pa.

Apr. 5, 2010) (finding hourly rate of $400 reasonable for attorney with ten years of experience);

*Holliday v. Cabrera & Assocs., P.C.*, No. 05–0971, 2007 WL 30291, at *4 (E.D. Pa. Jan. 4,

2007) (finding hourly rate of approximately $400 to be reasonable for an attorney engaged in

commercial litigation in Eastern Pennsylvania); *see also* Community Legal Services ("CLS") of

Philadelphia Chart of Hourly Rates for Attorney Fees[10] (hourly rates ranging from $520–590 for

attorneys with 21–25 years of experience); *Navarro v. Monarch Recovery Mgmt. Inc.*, No. 13-

3594, 2014 WL 2805244, at *4 (E.D. Pa. June 20, 2014) ("courts in this district have relied upon

the CLS fee schedule as an adequate determination of market rates in the Eastern District of

Pennsylvania" (collecting cases)).

---

[9]      The Court likewise finds the comparable hourly rates charged by the three other attorneys at the firm—
$350 for Dennis M. McCarthy, $300 for Mark D. Aurand, and $200 for Marc A. Albanese—to be reasonable.  *See*
(Aff. Ex. A ¶¶ 6–7, ECF No. 15).

[10]      *See* Attorney Fees, Community Legal Services of Philadelphia (September 12, 2014),
https://clsphila.org/about-cls/attorney-fees.

Stevens submitted a detailed billing report and timekeeper log of the actual time spent working on the case from May 2015 to the present.  *See* (Aff. Ex. A, ECF No. 15).  The report details the reasonable costs that WM incurred, including filing fees, publication fees and other administrative costs.  (*Id.* ¶ 15.) The timekeeper log allocates the attorneys' work in tenth of an hour intervals and describes the nature of the work and tasks performed with reasonable specificity.  *See* (*id*).  The Court has examined the report in detail and determined that the time expended on each of the tasks described in the time entries was reasonable.  *See Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001) ("In calculating the hours reasonably expended, a court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary." (internal quotations omitted)).

The total amount requested for attorneys' fees comes to $24,863.50.  This figure is supported by Counsel's reasonable rates and reasonable time expended.  Moreover, this figure is reasonable given the complex and convoluted nature of the case, the significant amount of damages at stake, the eighteen-month period for which the firm has been working on the case and the favorable result that was ultimately obtained.  *See* N.J. Rules Prof'l Conduct R. 1.5. Finally, the figure does not need to be decreased on account of "limited success" because WM prevailed on all of its claims and obtained nearly all of the damages it sought.  *See New Jerseyans for Death Penalty Moratorium v. N.J. Dep't of Corr.*, 883 A.2d 329, 339 (N.J. 2005). WM has thus provided sufficient support for attorneys' fees in the amount of $24,863.50 and costs and expenses in the amount of $4,135.22.

## III.

WM has presented sufficient evidence of the Court's personal jurisdiction over the defaulting defendants, proper service of process upon the defaulting defendants, the facts necessary to state a cause of action; and the appropriate amount of damages. *D'Onofrio*, 430 F. Supp. 2d at 436. The Court will now turn to the three factors that control whether a default judgment should be granted: (1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct. *See $55,518.05 in U.S. Currency*, 728 F.2d at 195.

WM would be prejudiced if default judgment were denied since it has presented sufficient evidence that Defendants' breaches of the Guaranty have caused it significant monetary injury, it has no other remedy against Defendants and Defendants have indicated no desire to appear or otherwise defend themselves in the matter. *See Summit Tr. Co. v. Paul Ellis Inv. Assoc., LLC*, No. 2:12- 6672, 2013 WL 3967602, at *4 (E.D. Pa. Aug. 2, 2013); *Doe v. Simone*, No. 12-5825, 2013 WL 3772532, at *5 (D.N.J. July 17, 2013). There does not appear to be any meritorious defense to WM's claim since Defendants have not entered an appearance or filed a response to the Complaint. *See Summit Tr. Co.*, 2013 WL 3967602, at *4; *Simone*, 2013 WL 3772532, at *5; *see also Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 271 (E.D. Pa. 2014) ("Second, outside of the court's obligation to decide whether it has jurisdiction and whether the complaint states a claim, the court may presume that an absent defendant who has failed to answer has no meritorious defense because [i]t is not the court's responsibility to research the law and construct the parties' arguments for them." (internal citations and quotations omitted)). Finally, Defendants' failure or refusal to "engage[ ] in the litigation process and [to] offer[ ] no reason for this failure or refusal" may "qualif[y] as culpable conduct with respect to

the entry of a default judgment—indeed, for the Court to conclude otherwise would be to reward the recalcitrant or the oppositional and uncooperative." *Joe Hand Promotions, Inc.*, 3 F. Supp. 3d at 272 (quoting *E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 657 F. Supp. 2d 545, 554 (E.D. Pa. 2009)).  Even were the Court to consider the third factor inconclusive since Defendants' failure to appear has rendered the Court "unable to assess whether Defendant's own conduct caused delay," *Simone*, 2013 WL 3772532, at *5, the first two factors weigh in favor of entering default judgment.  The "equities of the situation and the need for the efficacious resolution of controversies" thus weigh in favor of entering default judgment.  *Summit Tr. Co.*, 2013 WL 3967602, at *4 (quoting *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984)). Default judgment is entered in favor of WM against Defendants Ruble and Benner for $791,483.86 in damages, $24,863.50 in attorneys' fees and $4,135.22 in costs and expenses.

An appropriate order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.